UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**UNITED STATES OF AMERICA**

v.  Case No.: 8:10-CR-0254-T-17EAJ

**ROBERT STEVEN HARRELSON**

_____/

**REPORT AND RECOMMENDATION**

Before the court is Defendant's **Motion to Suppress Any and All Physical Evidence and/or Statements** (Dkt. 24), the United States' **Response in Opposition** (Dkt. 29), and Defendant's **Reply** (Dkt. 31).[1] An evidentiary hearing and oral argument have been held. For the reasons stated herein, I recommend that the motion to suppress be denied.[2]

**Findings of Fact**

The following facts are established by a preponderance of credible evidence:

1. On March 16, 2010, a previously reliable confidential informant working for the Hardee County Drug Task Force ("the Task Force") participated in a controlled purchase of methamphetamine in Hardee County. The informant reported that an individual known as "Little Rob," who drove a maroon/red Ford F-150 pickup truck, was present and approved the transaction. Based on this information, Lieutenant Craig Aument ("Aument") of the DeSoto County Sheriff's Office later identified Little Rob as Defendant, Robert Steven

---

[1] The motion has been referred to the undersigned for a report and recommendation (Dkt. 26). See 28 U.S.C. § 636(b); Local Rules 6.01(b) and (c), M.D. Fla.

[2] As I recommend that the motion be denied, the United States' argument that the motion should be denied as untimely is moot. Regardless, Defendant has demonstrated that any untimeliness in filing the motion should be excused.

     Harrelson.[3]

2. On March 26, 2010, Officer Pitts of the Arcadia Police Department told Aument that, according to a previously reliable confidential informant,[4] Defendant was going to deliver methamphetamine to a residence in Arcadia, DeSoto County, Florida.[5] The residence was placed under surveillance, but Defendant never appeared.

3. Aument called Sergeant Eddie Davis ("Davis"), a supervisor with the Task Force, and advised that Defendant had been expected to deliver methamphetamine to a residence in DeSoto County, but never appeared. Anticipating that Defendant was on his way to Hardee County, Aument asked that Defendant's maroon/red Ford F-150 be intercepted.

4. Davis directed Task Force members to be on the lookout for a maroon/red Ford F-150 that might be carrying methamphetamine and to attempt to obtain probable cause for a traffic stop. The task force members included Detective Jonathan Corwin ("Corwin"), Detective Jamie Wright ("Wright"), and Detective Matt Whatley ("Whatley").

5. At approximately 11:00 p.m., Whatley notified the Task Force that a maroon/red Ford F-150 was traveling east on Highway 64.

6. Wright was parked in an unmarked Ford Explorer SUV with his headlights shining across Highway 64. At approximately 11:00 p.m., Wright heard the noise of a loud muffler and, moments later, a maroon/red Ford F-150 drove in front of the Ford Explorer SUV on

---

[3] Aument utilized law enforcement personnel and files, including photos and tag information, to identify "Little Rob" as Defendant. Defendant had a prior criminal history involving drugs.

[4] This was a different informant than the one involved in the March 16 drug purchase.

[5] Whether the informant referred to "Robert Harrelson" or "Little Rob" is immaterial as Aument had determined they were one and the same.

        Highway 64. Wright was unable to see through the tinted side windows of the Ford F-150.[6]

7.     Wright began following the F-150, which proceeded through a green light that subsequently turned red, causing Wright to stop.

8.     Wright caught up to the F-150 on a road known as Steve Roberts Special. As the F-150 neared the intersection of Steve Roberts Special and Morgan Road, its left turn signal activated.

9.     Near its intersection with Steve Roberts Special, Morgan Road is a dead-end street in a rural area. The Task Force had previously conducted controlled purchases of methamphetamine from a residence in the vicinity of Morgan Road where the F-150 was being surveilled. Based on intelligence and past investigations, Wright suspected that Defendant was headed to that residence.

10.     As Wright engaged his blue lights, the F-150 immediately pulled over to the side of Steve Roberts Special and came to a complete stop at 11:20 p.m.[7]

11.     Corwin approached the F-150 and determined that Defendant was the driver and sole occupant.

12.     Corwin asked Defendant to produce his drivers license and registration. Defendant asked whether he had been pulled over for speeding.

13.     Corwin asked Defendant if he had been arrested before. Defendant replied that he had been arrested for drug possession.

---

[6] The muffler was louder than what Wright was accustomed to hearing from a Ford F-150.

[7] Wright also suspected that the driver of the F-150 may have been intoxicated because the vehicle appeared to be speeding and crossed over the yellow line at the road's edge at some point. However, Wright subsequently determined that Defendant was not intoxicated.

14. Corwin directed Defendant to exit the F-150 and to move to the front of Wright's unmarked SUV. Defendant immediately complied.

15. Corwin asked Defendant if he had any guns or knives on his person. Defendant shook his head in the negative. Corwin then asked "do you mind if we check?" Defendant shook his head in the negative and tapped his chest in a manner indicating compliance with Corwin's request.

16. Corwin directed Defendant to place his hands on the hood of the unmarked SUV. Defendant immediately complied.

17. Corwin removed paper money from the front pocket of Defendant's shirt and a wallet from the back pocket of Defendant's pants. Corwin counted the paper money and inspected the contents of the wallet.

18. While Corwin searched Defendant, Whatley led a K-9 named Cai around the F-150. Cai, a trained drug detection dog, gave a positive alert on the second pass around the vehicle.

19. Corwin advised Defendant that Whatley's K-9 had alerted to the F-150 and asked whether Defendant objected to a search of his vehicle. Defendant refused consent. Officers nonetheless began searching the F-150.

20. After methamphetamine was found in the F-150, one of the officers searching it approached Defendant and directed him to put his hands on the hood of the unmarked SUV. Defendant was placed under arrest and handcuffed, less than eight minutes after the F-150 came to a complete stop.

21. The next day, Wright determined that the F-150's front side windows allowed only 17% of light to pass through them, in violation of Florida law requiring that a vehicle's front

windows allow at least 28% of light to pass through them.

## Conclusions of Law

Defendant contends that his Fourth Amendment rights were violated because: 1) the stop was not justified by reasonable suspicion or probable cause; and 2) the frisk was conducted pursuant to an unlawful stop and exceeded the scope allowed to protect officer safety.

### I.     The Stop

"[L]aw enforcement agents may briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity." United States v. Hensley, 469 U.S. 221, 226 (1985) (citation omitted). Whether an officer has reasonable suspicion turns on whether the "totality of the circumstances" reflect a "particularized and objective basis for suspecting wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002) (citation and internal quotation marks omitted). Law enforcement agents may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." Id. (citation and internal quotation marks omitted).

At the time he stopped Defendant, Wright had been advised that a red/maroon Ford F-150 might be heading to Hardee County with methamphetamine. Moreover, Wright was aware that controlled purchases of methamphetamine had been conducted at a residence on Morgan Road, a dead-end street in a rural area, near its intersection with Steve Roberts Special. Wright did not activate his blue lights until the F-150's turn signal indicated it was about to turn onto Morgan Road from Steve Roberts Special. Considering the totality of the circumstances, Wright had a reasonable suspicion that an occupant of the F-150 was transporting methamphetamine. He was therefore entitled to briefly stop the F-150 to investigate that suspicion. See, e.g., United Stated v. Lindsey,

482 F.3d 1285, 1291 & n.3 (11th Cir. 2007) (finding reasonable suspicion provided by 911 caller's tip that four men were loading guns into an SUV, the nearby location of a bank, and an ongoing independent investigation of recent unsolved armed bank robberies by four men of the same race as those identified in the tip).[8]

**II.   The Frisk**

Defendant maintains that Corwin's search of Defendant's person was unreasonable and violated Defendant's Fourth Amendment rights. This issue need not be resolved because "the information ultimately or inevitably would have been discovered by lawful means." Nix v. Williams, 467 U.S. 431, 444 (1984). Once Whatley's K-9 alerted to the F-150,[9] the officers had probable cause to search it. See United States v. Banks, 3 F.3d 399, 402 (11th Cir. 1993) (per curiam) (citations omitted). Their discovery of methamphetamine in the vehicle justified Defendant's arrest and would have permitted them to search Defendant's person incident to that arrest. Corwin's seizure and inspection of Defendant's cash and wallet would have been lawful pursuant to a search incident to an arrest for possession or distribution of methamphetamine. See United States v. Diaz-Lizaraza, 981 F.2d 1216, 1223 (11th Cir. 1993) (finding search of defendant's wallet was reasonable as a search incident to arrest for distributing cocaine) (citations omitted); United States v. Richardson, 764 F.2d 1514, 1527 (11th Cir. 1985) (holding that a search incident to arrest "may properly extend to personal property such as a wallet found on the person

---

[8] Even if Wright lacked a reasonable suspicion that an occupant of the F-150 was involved in the transportation of methamphetamine, he had probable cause to stop the vehicle for unlawfully tinted windows and/or a modified muffler.

[9] Defendant does not argue that Whatley's inspection of the exterior of the F-150 was the product of an illegal search. In any event, Whatley began his inspection about the same time that Corwin began going through Defendant's pockets.

of the arrestee") (citations omitted).  The mere fact that the F-150 was searched after Defendant's person was searched does not justify suppression of the evidence found on his person.  See, e.g., United States v. Smith, 694 F. Supp. 2d 1242, 1258 (M.D. Ala. 2009) (declining to suppress evidence found during frisk because evidence would have been found during search incident to arrest for possession of cocaine found in automobile).

## Conclusion

Because Wright had a reasonable suspicion that an occupant of the F-150 was transporting or distributing methamphetamine, he was entitled to briefly stop the F-150 to investigate that suspicion.  As Defendant would have been subject to a search incident to arrest following the discovery of methamphetamine in the F-150, the evidence obtained from Corwin's search of Defendant's person would have been inevitably discovered.  The issue of whether Defendant consented to a search of his person is moot under the "inevitable discovery" doctrine.  Therefore, the Fourth Amendment does not require suppression of the evidence found in the F-150, the evidence found on Defendant's person, or Defendant's statements.

Accordingly, and upon consideration, it is **RECOMMENDED** that:

(1)     Defendant's Motion to Suppress Any and All Physical Evidence and/or Statements (Dkt. 24) be **DENIED**.

**Date:  December 27, 2010**

ELIZABETH A JENKINS
United States Magistrate Judge

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of this service shall bar an aggrieved party from attacking the factual findings on appeal. See 28 U.S.C. § 636(b)(1).

**Any party objecting to the factual findings in the report and recommendation shall file a copy of the transcript with the filing of the objections.**


Copies to:
Counsel of Record
District Judge